UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 0:08-CV-60273-UNGARO/TURNOFF

ELISABETH EBERLI, as Personal
Representative of the Estate of FRITZ ERNST
SCHODER, Deceased, a Florida representative
of a Florida decedent,

      Plaintiff,

v.

CIRRUS DESIGN CORPORATION,
a foreign corporation,

      Defendant/Third Party Plaintiff,

v.

TELEDYNE CONTINENTAL
MOTORS, INC.,

      Third Party Defendant.

_____/

## TELEDYNE CONTINENTAL MOTORS, INC.'S MOTION TO PRECLUDE AND/OR LIMIT TESTIMONY OF PLAINTIFF'S EXPERTS DONALD SOMMER, ARTHUR LEE COFFMAN AND CIRRUS' EXPERT DAVID KLEPACKI

Defendant, Teledyne Continental Motors, Inc. ("Teledyne"), moves for an order precluding and/or limiting the testimony of experts, Donald Sommer, Arthur Lee Coffman and David Klepacki[1] and states:

1.     Plaintiff's husband, Fritz Ernst Schoder, was the pilot of a Cirrus SR 20 aircraft when it crashed into the Atlantic Ocean near the coast of Greenland. (Am. Comp. at ¶¶ 12, 23).

2.     Plaintiff filed an action against Cirrus Design Corporation ("Cirrus"), the aircraft manufacturer. After Cirrus filed a Third-Party Complaint against the engine manufacturer,

---

[1] Copies of all depositions cited herein have been separately filed with the Court under a Notice of Filing Depositions. (See DE 95).

Teledyne, Plaintiff then amended her Complaint to include Teledyne. Plaintiff's claims are based on negligence and strict liability. (Am. Comp. ¶¶ 7, 9, Counts I-IV).

3.      The aircraft and engine were never recovered. Accordingly no one – including the parties to this litigation or the persons responsible for investigating this accident – has ever had the opportunity to examine the aircraft or its engine to determine the cause of the crash.

4.      Plaintiff's theory is that Mr. Schoder's engine failed because the breather line froze and prevented oil from flowing into the engine. A breather line is nothing more than a rubber hose that vents the engine and serves as a line for air and oil to separate, allowing oil to recirculate in the engine. It is undisputed that Teledyne's engines do not arrive at Cirrus' facility with a breather line attached. Rather, breather lines are component parts of Cirrus' aircraft.

5.      Plaintiff claims that Cirrus should have insulated the breather line to protect it from freezing and that the failure to do so was the cause of the accident.

6.      As to Teledyne, Plaintiff's experts refer to Teledyne's Installation Guidelines which advise, "a suitable means of protecting the discharge tube [breather line] to prevent freezing may be required." (DE 85 – Attachment Number 4, which was filed under seal by Plaintiff). Plaintiff contends Teledyne should have reiterated that statement during the performance of an installation audit in 2003.[2] However, Plaintiff's experts acknowledge that Teledyne could not require Cirrus to comply with that very recommendation. Plaintiff also claims that Teledyne could have redesigned its engine so that the location of the breather line connection was in a different position and thus not exposed to incoming cool air.

_____

[2] The purpose of the installation audit is to "make sure that the manufacturer of the airframe [e.g., Cirrus] that's incorporating the engine is complying with Teledyne's specifications for installation" and to see the data that the airframer may have that supports that." (DE 95 - Exh. A at 77). This installation audit is not performed on every aircraft; instead, it is "only done on an aircraft early in the sort of production of the aircraft." (Id. at 78). The actual audit is performed by the airframe manufacturer, such as Cirrus, and the airframe manufacturer then provides the data for review by Teledyne. (Id. at 103-04).

7.      Both Plaintiff and Cirrus opine that if the accident was not caused by a frozen breather line, then there must have been a malfunction of the engine.

8.      Teledyne moves to limit or exclude the following opinions offered by Plaintiff's expert, Donald Sommer:

  (a)     the breather line connection should have been placed in a different location (DE 95 - Exh. B);

  (b)     Teledyne should have advised Cirrus to insulate the breather line at the time they audited the engine installation (Id. at 211-12); and

  (c)     another "potential possibility" is that there was an expulsion of oil from the engine (Id. at 5).

9.      Teledyne moves to limit or exclude the following opinions offered by Plaintiff's expert, Arthur Lee Coffman:

  (a)     Coffman was "surprised" Teledyne had conducted an Installation Audit and made no reference to the lack of insulation on the breather line. (DE 95 - Exh. C).

  (b)     Coffman was "surprised" Teledyne did not make any reference during the Installation Audit to the inclusion of an air/oil separator because he "always felt that [Teledyne] did not recommend breather separators" (Id. at 119; see also 114).

  (c)     Coffman was "surprised" to see a rubber hose being used as an oil breather line. (Id. at 114-15).

  (d)     Coffman cannot "rule out" an oil leak causing the accident. (Id. at 6).

10.     Teledyne moves to limit or exclude the following opinions offered by Cirrus' expert, David Klepacki:

  (a)     the engine failure was caused by something other than a frozen breather line (DE 95 - Exh. D at 185); and

  (b)     the more likely causes of engine failure are related to components of the engine including the oil delivery system, the cylinder assembly, a cracked crankcase or an oil leak in general. (Id. at 187).

11.     Finally, to the extent the opinions offered by the experts are the same, Plaintiff should be limited to one expert per opinion.

**WHEREFORE**, Teledyne requests the entry of an order precluding and/or limiting the testimony of experts, Sommer, Coffman and Klepacki. In support, Teledyne submits the following Memorandum of Law.

<u>**MEMORANDUM OF LAW**</u>

I.  **INTRODUCTION**

Pursuant to Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993), the Supreme Court held that expert testimony is admissible only where it is both relevant and reliable. The objective of this "gatekeeping" is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co., Ltd v. Carmichael</u>, 526 U.S. 137, 152; <u>see also</u> <u>Daubert</u>, 509 U.S. at 597. The proponent of the expert's proffered testimony bears the burden of establishing the testimony is reliable and relevant. <u>See, e.g.</u>, <u>U.S. v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004).

As to relevancy, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." <u>Daubert</u>, 509 U.S. at 591 (quoting Rule 702). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." <u>Daubert</u>, 509 U.S. at 591. As to reliability, proposed expert testimony must be trustworthy and supported on "good grounds." <u>See id.</u> at 590 & 590 n.9. That is, the district court must determine whether the proffered testimony is based on a sufficiently reliable foundation and methodology." <u>See id.</u> at 597.

Consistent with the foregoing, it is textbook <u>Daubert</u> law that an expert's opinion testimony must have "sufficient 'factual underpinnings.'" <u>Goodwin v. MTD Prods. Inc.</u>, 232 F.3d 600, 608 (7th Cir. 2000); <u>Bourelle v. Crown Equip. Corp.</u>, 220 F.3d 532, 536 (7th Cir. 2000); <u>see also</u> <u>Glastetter v. Novartis Pharm. Corp.</u>, 252 F.3d 986, 988 (8th Cir. 2001) (expert opinion must be supported by "good grounds" based on what is known). An expert's opinion, based on assumed facts, must find some support for those assumptions in the record. <u>See</u> <u>Shaw v. Strackhouse</u>, 920 F.2d 1135, 1142 (3d Cir. 1990). "The Federal Rules of Evidence allow a court to intercede and limit expert testimony . . . when there is no factual basis for that proffered opinion." <u>O'Conner v. Commonwealth Edison Co.</u>, 807 F. Supp. 1376, 1389 (C.D. Ill. 1992) (citing Rules 702 & 703).

Likewise, an expert's opinion cannot be based on speculation and an expert's guess is clearly improper and inadmissible under <u>Daubert</u>. <u>See</u> <u>Rosen v. Ciba-Ceigy Corp.</u>, 78 F.3d 316, 319 (7th Cir. 1996) ("[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."; "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort."); <u>Montgomery v. Mitsubishi Motors Corp.</u>, 448 F. Supp. 2d 619 (E.D. Pa. 2006) (to satisfy the reliability element of <u>Daubert</u>, an expert's testimony must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief.). As gatekeepers, district court judges must "determine whether evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." <u>Rosen</u> at 318; <u>see also</u> <u>Pride v. BIC Corp.</u>, 218 F.3d 566, 578 (6th Cir. 2000) (affirming exclusion of expert testimony regarding the cause and origin of a fire purportedly caused by a lighter, due to a failure to conduct testing).

Finally, as the Supreme Court recognized: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." <u>Daubert</u>, 509 U.S. at 595. Therefore,

in assessing the admissibility of expert testimony, the court must also consider Fed. R. Evid. 403, permitting the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ." See In re Air Disaster at Lockerbie, 37 F.3d 804, 924 (2d Cir. 1994) (district court may "refuse to entertain expert testimony it thinks unhelpful, cumulative, confusing to the jury or more prejudicial than probative.").

## II.   SOMMER'S OPINIONS AS TO TELEDYNE SHOULD BE LIMITED AND/OR EXCLUDED

Plaintiff's expert, Donald Sommer, was deposed on March 23, 2009. (DE 95 - Exh. B). Sommer opined that the engine failed because a blockage in the breather line caused the engine to lose oil. According to Sommer, the blockage occurred when moisture produced by the crankcase froze within the breather line during flight. (Id. at 46, 73, 97).[3] Sommer acknowledged the breather line was not designed or manufactured by Teledyne. (Id. at 197). Nevertheless, he offered the following opinions as to Teledyne which are each inadmissible.

### A.   Sommer's Opinion That The Breather Line Connection Should Have Been Located In A Different Place Is Inadmissible

Sommer opined Teledyne is liable because it designed the engine with the breather line connection in a location that exposed it to incoming cold air. (Id. at 97). According to Sommer, there was no "reason in the world" the oil breather line connection needed to come out of the front of the engine. (Id. at 199). Sommer noted that Teledyne's IO-550 model engine, used in another model Cirrus aircraft (the SR-22), is designed with the breather line connection in the back of the engine. (Id. at 106, 199-202). However, Sommer had not seen any of the engine specifications or engineering drawings for the IO-550 model engine and did not know the length

---

[3] Plaintiff's expert Coffman offers the same opinion as referenced in section II, infra.

of that engine or exactly where the breather line connection was on that engine. (Id. at 200, 202-04).

To redesign the engine and to move the breather line connection, Sommer stated it would involve a change in the type design and require approval by a DER[4] (Id. at 216). He agreed it would be difficult to redesign the crankcase, but said he did not believe Teledyne would have to do that. (Id. at 216-17). Nor did Sommer have the parameters of the inside of the engine that would be necessary to evaluate an engine redesign. He had not tried to study them to redesign the engine. (Id. at 217). Further, he agreed that the location of the breather line connection on the subject engine was common practice and in use for many years by Teledyne. (Id. at 204-05). In fact, he was not even sure that Teledyne's design with the breather line connection in the front of the engine was negligent. (Id. at 215).

### 1.    Sommer's opinion is not based on a sufficiently reliable foundation

Sommer has no basis for his opinion that the breather line connection should be located somewhere else. Rather, he simply offers an opinion as to a more suitable location without conducting any testing, without any factual basis that another location would be better, and without determining how the design change would be accomplished. Under established law, this opinion as to an alternative design has no basis and should be excluded.

In Cummins v. Lyle Industries, 93 F.3d 362 (7th Cir. 1996), the district court found that an expert lacked a reliable basis for his proposed opinion because the expert never tested his alternative design. The Seventh Circuit affirmed finding that "the first and most significant Daubert factor is whether the proffered opinion has been subjected to the scientific method." Id. at 368. Further, the court stated that where opinions "clearly lend themselves to testing and substantiation by the scientific method," the absence of such testing indicates that a witness's

---

[4] DER is a Designated Engineering Representative. This individual is not a Teledyne employee.

testimony is not scientific knowledge. Id. at 368, 369. Accordingly, because the expert had not tested his alternative design, the court held that the district court properly excluded his opinion. Id. at 370; see also Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1083-84 (8th Cir. 1999) (when engineers opine that a product should be designed differently, the district court properly looks to Daubert as to whether the testimony should be excluded; affirming exclusion of engineer's testimony that product was defective in that it lacked safety device because engineer did not construct safety device or test its utility as a safety device, nor pointed to any manufacturer that used device); Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293 (8th Cir. 1996) (excluding alternative design testimony where theories were not tested); Byrnes v. Honda Motor Co., 887 F. Supp. 279 (S.D. Fla. 1994) (excluding alternative design testimony); Rogers v. Ford Motor Co., 952 F. Supp. 606, 614 (N.D. Ind. 1997) (same); see also cases cited at section I, supra.

Because Sommer is offering an opinion without conducting testing and without proper foundation, his opinion regarding the propriety of the breather line connection's location should be excluded.

**B.   Sommer's Opinion Relating To The Breather Line Installation Audit Is Inadmissible[5]**

Sommer testified that Teledyne's guidelines for installation of this model engine stated that a suitable means of protecting the discharge tube from freezing may be required. (DE 95 - Exh. B at 106). Although the guidelines already address the issue, Sommer claims that Teledyne should have "picked up" the lack of insulation during an installation audit in 2003 (Id. at 210-11). However, when asked to further explain, all Sommer could say was that Teledyne "should have gone to Cirrus and said we looked at your engine and it doesn't have an insulated breather line and we think it should. And hopefully, Cirrus would have picked up from there." (Id. at 212). Sommer acknowledged that Teledyne could not mandate what Cirrus did with the

_____

[5] Plaintiff's expert Coffman offers the same opinion, as discussed in section III(A), infra.

breather line. (Id. at 211). Short of going to the FAA and requiring them to issue an Airworthiness Directive, Sommer testified there was no way to force Cirrus to include the insulation sleeve on the breather line. (Id. at 212-13).

Further, when Sommer was asked the basis for his opinion that Teledyne did not relay this information to Cirrus during that audit, his only response was that the audit did not include such a reference. (Id. at 211-12).[6] From this, Sommer concluded there was "never any word [to Cirrus] that the breather line did not have insulation and that it was exposed on top of the engine." (Id. at 107; see also Id. at 197, 212). But, Sommer had no way to know if Teledyne communicated with Cirrus about the insulation sleeve beyond what Sommer assumed from reading the audit. (Id. at 212).

> **1.** **Sommer's opinion is not based on facts in evidence, is inadmissible speculation, irrelevant, and could only serve to confuse or mislead the jury and prejudice Teledyne**

Sommer's opinions with regard to Teledyne's liability based on the installation audit are nothing more than inadmissible speculation as to what may or may not have been communicated during the installation audit and what might or might not have happened if Teledyne reiterated the need for insulation at the audit in 2003. Such speculation is not based on any specialized knowledge, cannot form the basis of an expert opinion and will be of no assistance to the jury. Sommer's guess as to what conversations took place is improper and inadmissible. See cases cited at section I, supra.

In addition, Sommer acknowledged that Teledyne's installation guidelines did inform Cirrus that a "suitable means of protecting the discharge tube to prevent freezing may be required" and further acknowledged Teledyne could not force Cirrus to do anything with regard to the breather line. As such, Sommer's opinion that Teledyne should have done something more,

---

[6] His opinion was limited to what Teledyne should have done at the audit. (DE 95 - Exh. B at 212).

improperly suggests a duty that does not exist and can only confuse or mislead the jury and prejudice Teledyne. See Fed. R. Evid. 403.

### C. Sommer's Opinion That A "Secondary Possibility" Exists As To The Engine Failure Is Inadmissible

Although Sommer opined that the cause of the engine failure was a frozen breather line, he also opined that a "secondary possibility" was a malfunction of engine components. (Id. at 5). Sommer ultimately concluded the failure modes of the engine components he identified are not consistent with the accident sequence as reported by Mr. Schoder. (DE 95 - Exh. B at 87-95, 100, 229).

#### 1. Sommer's opinion is not based on facts in evidence, is inadmissible speculation, irrelevant and could only serve to confuse or mislead the jury and prejudice Teledyne

Sommer's opinion regarding "possibilities" is entirely speculative and inadmissible. See cases cited at section I, supra. It is not based on the sufficient factual underpinnings required by Daubert nor is it otherwise supported by good grounds. Further, because Sommer acknowledges that the other failure modes are not consistent with the accident, any opinion with regard to the other failure modes is wholly irrelevant and would only serve to confuse the jury and unduly prejudice Teledyne. See Fed. R. Evid. 403, 702; Daubert, 509 U.S. at 591 (expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue; "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). As such, this testimony is inadmissible.

### III.   COFFMAN'S OPINIONS AS TO TELEDYNE SHOULD BE LIMITED AND/OR EXCLUDED

Plaintiff's expert, Arthur Lee Coffman, was deposed on March 24, 2009. (DE 95 - Exh. C). Like Sommer, Coffman's primary opinion is that the most likely cause of this accident was

that Cirrus' oil breather line froze. (E.g., Id. at 5, 6, 115, 116).[7] In addition, he offered three opinions as to Teledyne – each of which is inadmissible.

A. **Coffman's Opinion Relating To The Breather Line Installation Audit Is Inadmissible[8]**

As previously discussed, the breather line and its insulation sleeve are not part of Teledyne's engine. (Id. at 167). Like Sommer, Coffman acknowledges Teledyne's guidelines advised Cirrus of potential breather line freezing and the need to protect against it. (Id. at 127; see also Exh. A ("suitable means" of "protecting" breather line "to prevent freezing may be required.")). Coffman opines, however, Teledyne performed an audit of the engine installation on the Cirrus SR20 and made no note of the un-insulated breather line. (Id. at 114). Coffman opines he was "surprised" that Teledyne performed the installation audit and did not make a recommendation that the breather line should have been insulated. (Id. at 114-15, 148). Ultimately, his opinion is that "Teledyne should have made a recommendation, not that Teledyne should have insisted Cirrus adhere to that recommendation." (Id. at 149).

Further, just like Sommer, Coffman has "no way of knowing if there was a discussion" between Teledyne and Cirrus as to the insulation on the oil breather line. (Id. at 127). He has not reviewed any Teledyne documents dealing with specifications for the oil breather line. (Id. at 124). Coffman agrees it was possible there were conversations between Teledyne and Cirrus about the insulation of the oil breather line. (Id. at 128). He ultimately concedes: "[t]here's no way to say whether it took place or not and there may be more audits than I have seen." (Id. at 128).

---

[7] Plaintiff's expert Sommer offers the same opinion, as referenced in section II, supra.
[8] Plaintiff's expert Sommer offers the same opinion, as discussed in section II(B), supra.

**1.      Coffman is not qualified to testify as to what an engine manufacturer, such as Teledyne, should communicate to an airframe manufacturer, such as Cirrus, during an installation audit**

Coffman is a consultant with Aero Services Unlimited and has been since 1996. (Id. at 51). Prior to that, he had experience as an aircraft mechanic, service manager and quality control manager. (Id. at 32, 35-36, 39, 41, 49-51).

Coffman has not participated in any engine audits for engine installers such as Cirrus (Id. at 120). He has not been involved in installation audits that used an engine manufacturer's guidelines. (Id. at 121). He previously purchased Teledyne engines as a distributor, but has never performed an installation audit for Teledyne. (Id. at 120-21). When asked the purpose of an installation audit, he replied "I assume that it meets your standard." (Id. at 121).

Although Coffman may be qualified with respect to other areas involving engines, Plaintiff – as the proponent of this expert – failed to establish that he is qualified to render opinions as to the protocols and scope of an installation audit. See Fed. R. Evid. 702; Dura Automotive Systems of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 614 (7th Cir. 2002) (hydogeologist, who was not an expert in mathematical models of groundwater flow was not qualified to testify that the modeling he used in forming his opinion regarding a well field's capture zone was reliable and appropriate for determining the well field's capture zone thirty years ago); Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999) ("a district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject"); Robertson v. Norton Co., 148 F.3d 905, 907 (8th Cir. 1998)(striking expert's proffered warnings testimony; while the expert was qualified to testify about a manufacturing defect in an exploding ceramic grinding wheel, that did not qualify him as an expert on grinding wheel warnings, where expert had never designed a warning for a ceramic product and his knowledge of ceramics did not provide the expertise on questions of display,

syntax and emphasis that the jury would expect from a warnings expert); Malave-Felex v. Volvo, 946 F.2d 967, 973 (1st Cir 1991)(engineer who was qualified in automotive systems could not offer opinion as to cause of accident that was dependent on mental processes and human factors). Coffman's experience as an airplane mechanic does not qualify him to offer opinions about Teledyne's Installation Audit. He does not possess the expertise a jury would expect.

> **2.      Coffman's opinion is not based on facts in evidence, is inadmissible speculation, irrelevant, and could only serve to confuse or mislead the jury and prejudice Teledyne**

Coffman's opinion is unreliable because he has no knowledge as to all of the communications between Teledyne and Cirrus and has no way of knowing if Teledyne actually made such a recommendation to Cirrus. Thus, Coffman has absolutely no basis from which to opine that – even if Teledyne was required to reiterate its recommendation to Cirrus regarding preventing freezing in the breather line – Teledyne did not in fact reiterate such recommendation during the installation audit. See cases cited at section I, supra.

Further, Coffman admits Teledyne advised Cirrus regarding the potential for freezing and the need to protect against it. Notwithstanding, Coffman seeks to tell the jury that, in addition thereto, Teledyne should have recommended to Cirrus that they insulate the breather line to prevent freezing. (Id. at 148). Coffman ultimately clarifies, however, that Teledyne was not required to "insist[]" that Cirrus adhere to that recommendation. (Id. at 149). But, Plaintiff has failed to establish that Teledyne even had a duty to reiterate during the installation audit the very recommendation contained in the written guidelines. To allow Coffman to offer an opinion as to what Teledyne should have recommended to Cirrus – in addition to what it had already recommended – could only serve to confuse or mislead the jury and prejudice Teledyne. See Fed. R. Evid. 403.

B.    **Coffman's Opinion Regarding Lack Of Reference To The Air/Oil Separator Is Inadmissible**

Teledyne does not manufacture the air/oil separator.

Coffman opines he was "surprised" to see an air/oil separator because "[i]t's the first air/oil separator that I have seen on a single-engine production airplane like this" and that its inclusion "may also be a reason for freezing." (Id. 114, 135, 138). More specifically, Coffman states he was "rather surprised" Teledyne did not make any reference during the installation audit to the inclusion of an air/oil separator because he "always felt that [Teledyne] did not recommend breather separators." (Id. at 119). Coffman believes "people that sell air/oil separators have been trying to get the airframe manufacturers to buy them and put them on for years which they have resisted." (Id. at 137). He opines the inclusion of the air/oil separator did not cause the accident but it "could contribute to it" because it is "one more item that can freeze up." (Id. at 138). Ultimately, he states that he is not offering an opinion that the air/oil separator froze. (Id. at 184).

1.    **Coffman is not qualified to testify as to what an engine  manufacturer, such as Teledyne, should or should not communicate to an airframe manufacturer, such as Cirrus, during an installation audit**

Teledyne adopts its argument set forth at section III(A)(1), supra.

2.    **Coffman's opinion is not based on facts in evidence, is inadmissible speculation, irrelevant, and could only serve to confuse or mislead the jury and prejudice Teledyne**

An expert witness may not speculate. See Fed. R. Evid. 702; see also cases at section I, supra. Coffman's haphazard opinion that the inclusion of the air/oil separator "could contribute" to the accident because it is a component that "can freeze up" is a textbook example of an opinion entirely void of the reasoned judgment that should accompany an expert's opinion. For this reason, this opinion should be excluded.  The testimony is not based on any facts or data, nor

is it the product of reliable principles. Rather, Coffman is guessing as to what could have contributed to this accident without any application of any technical or scientific facts.

Further, an expert's opinion must be relevant to an issue in the case. See Fed. R. Evid. 702; Daubert, 509 U.S. at 591 (expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue; "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). The fact that Coffman was "surprised" to see an air/oil separator is of no consequence to any of the issues in this case. More importantly, Coffman testified he does not intend to opine that the air/oil separator froze during this accident. (Coffman Depo. at 184). Because of this, Coffman should not be allowed to interject opinions as to the inclusion of the air/oil separator in this engine as it will only serve to confuse or mislead the jury and prejudice Teledyne. See Fed. R. Evid. 403.

## C.   Coffman's Opinion Regarding The Use Of A Rubber Hose as a Breather Line Is Inadmissible

Teledyne does not select the material for the breather line.

Coffman opines he was "surprised" to see that the hose used as a breather line was made of rubber and not aluminum. (Id. at 114-15, 128). He stated the "standard has been to use . . . aluminum tubing." (Id. at 129). He added "anything that is not standard would raise questions." (Id. at 129). Coffman admitted, however, that there is no written standard and that the FAA approved this very installation. (Id. at 130-32). He does not intend to raise this issue with the FAA. (Id. at 131). He concluded, "[i]t may be a very good installation.  It's just not – it was a – it is not what is common." (Id. at 131). Ultimately, and in response to a question as to whether the use of a rubber hose caused or contributed to this accident, Coffman opined "probably not." (Id. 183-84).

**1.**     **Coffman's opinion is not based on facts in evidence, is inadmissible speculation, irrelevant, and could only serve to confuse or mislead the jury and prejudice Teledyne**

An expert's opinion must be relevant to an issue in the case. See Fed. R. Evid. 702; Daubert, 509 U.S. at 591 (expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue; "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). Coffman ultimately opines the use of the rubber hose "probably [did] not" contribute to this accident." (DE 95 - Exh. C at 183-84). That he was "surprised" to see the breather line was a rubber hose is irrelevant and of no assistance to the jury in deciding an issue in this case. Because of this, Coffman should not be allowed to interject opinions as to an alleged deficiency that can only serve to confuse or mislead the jury and prejudice Teledyne. See Fed. R. Evid. 403.

**D.**     **Coffman's Opinion Regarding A Potential Oil Leak Is Inadmissible**

Coffman opines that the "symptoms of this aircraft are consistent with my experience with breather [line] issues over the years. We could have other issues which we – could always occur. You cannot rule out another – an oil leak causing this issue." (DE 95 - Exh. C at 6). Coffman goes on to clarify, however, "[i]t's not likely on a brand new engine that they start leaking oil after an hour or two. It has been known to occur, but not likely. The breather [line] is just the most likely source." (Id. at 6).

**1.**     **Coffman's opinion is not based on facts in evidence, is inadmissible speculation, irrelevant, and could only serve to confuse or mislead the jury and prejudice Teledyne**

An expert may not speculate. See Fed. R. Evid. 702; see also cases cited at section I, supra. Coffman's guess that an oil leak "could" occur is yet another example of an opinion entirely void of reasoned judgment. For this reason, this opinion should be excluded.

Additionally, an expert's opinion must be relevant to an issue in the case. See Fed. R. Evid. 702; Daubert, 509 U.S. at 591 (expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue; "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). Because Coffman ultimately testified that an oil leak is "not likely," he should not be allowed to interject irrelevant opinions on this issue that could only serve to confuse or mislead the jury and prejudice Teledyne.  See Fed. R. Evid. 403.

## IV. KLEPACKI'S OPINIONS AS TO TELEDYNE SHOULD BE LIMITED AND/OR EXCLUDED

Co-Defendant Cirrus' expert, David Klepacki, was deposed on March 26, 2009. (DE 95 - Exh. D). Klepacki opines that the engine did not fail as a result of a frozen breather line. (Id. at 165). Rather, in his opinion, there were four possible causes of the engine failure for which Teledyne, and not Cirrus, would be responsible. Each of these opinions is inadmissible. (Id. at 98).

While Klepacki did not offer an opinion regarding Teledyne's Installation Audit, he did testify about it. To the extent Klepacki intends to formally opine about that audit at trial, Teledyne seeks to preclude his testimony. Klepacki's testimony is not based on a sufficiently reliable foundational predicate, is not based on facts in evidence and will only serve to confuse or mislead the jury and prejudice Teledyne.  Specifically, Klepacki was asked if after reviewing select pages from the Installation Audit, was he able to "tell whether or not Teledyne actually looked into the potential for freezing in the breather line." He responded that he would assume Teledyne considered it, but he "just doesn't know for sure."  (Id. at 140)

### A.    Klepacki's Opinion That The Engine Failure Was Not Caused By A Frozen Breather Line is Inadmissible

Klepacki offered two bases for the opinion that the engine did not fail as a result of the breather line freezing. (Id. at 165). First, Klepacki cited a flight test performed by another expert,

Dr. Butler, which allegedly concluded that the temperature of the gas in the breather line was above freezing. (Id. at 88, 165, 180, 185). Klepacki conceded, however, he was not involved in the testing. (Id. at 91). As such, he admitted the conditions of the testing and the parameters of the testing would be something to discuss with Dr. Butler and Klepacki would defer to him. (Id. at 94, 169, 171). Indeed, he acknowledged that the opinions "as far as the flight test conclusion" came from Dr. Butler. (Id. at 171-72).

Second, Klepacki also compared the accident facts to those contained in reports of three other incidents allegedly involving frozen breather lines. (Id. at 86-88, 165-69, 185). But he conceded that the other incidents did not preclude a determination that there was another way in which the breather line could freeze. (Id. at 165-66). As such, he agreed that his opinion that the accident was not caused by a frozen breather line is "not based on the fact that these three others froze in a different way, it is based only really on the flight testing that Dr. Butler did." (Id. at 166).

1.    **An expert's opinion must be based on a sufficiently reliable foundational predicate and cannot simply parrot another expert's opinion**

The Federal Rules of Evidence and Daubert are clear that expert testimony must be based on some scientific, technical or other specialized knowledge. See Fed R. Evid. 702; Daubert, 509 U.S. at 590-91. Here, however, the expert conceded that his opinion concerning the frozen breather line was simply that of another expert and he had no information or involvement in the testing that formed the basis of the other expert's opinion. Because Klepacki's testimony in this regard does no more than parrot Butler's testimony, it is not based on any specialized, technical or scientific knowledge or methodology, and does not assist the trier of fact. See Robinson v. Ford Motor Co., 967 F. Supp. 482, 487 n.2 (M.D. Ala. 1997) ("An [expert] opinion which is

mere speculation or which simply parrots the opinion of another does not assist the trier of fact, and thus, is inadmissible under Rule 702 . . ."). As such, this testimony is inadmissible.

**B.**     **Klepacki's Opinions Regarding Alleged Engine Failure Are Inadmissible**

After testifying that in his opinion the breather line did not freeze, Klepacki opined that there were four potential causes of the engine failure for which Teledyne would be responsible: (1) the components related to the oil delivery system (oil pump, oil cooler); (2) the components related to the cylinder (piston rings, piston); (3) the crankcase; or (4) an oil leak in general. (DE 95 - Exh. D at 98). He opined that Teledyne was responsible for each of these alleged causes of the engine failure. (Id. at 98-101). However, Klepacki could not say which of these were most likely. (Id. at 98). Instead, he opined that "to a reasonable degree of certainty . . ." this engine failure was due to a problem in one of the four systems. (Id. at 102).

**Oil Delivery System:** According to Klepacki, the oil delivery system includes any part of the engine from the time it takes "oil from the sump" and runs it through the engine. (Id. at 98, 191). When asked if he had any specific evidence to indicate an oil delivery system caused the engine to fail, Klepacki responded "nothing specific. There is a possibility it could." (Id. at 188). He did no testing to support this opinion. (Id. at 194). And he conceded that "the failure of the oil delivery system does not seem to mirror the symptoms that Mr. Schoder reported to the other pilots." (Id. at 190). Indeed, he believed the likelihood that the failure resulted from the oil delivery system was "maybe a 25 percent possibility." (Id. at 194).

**Cylinder Components:** With respect to the cylinder assembly, Klepacki testified it would include problems with oil leaking from parts such as the connecting rods, piston rings, cylinder or head. (Id. at 195). If the pilot experienced a problem with leaking oil involving any of these parts of the engine, Klepacki would have expected the engine to run rough. (Id. at 195). Yet, Klepacki did not recall Schoder describing a rough engine. (Id. at 196). Again, he could not

state that it was more likely than not that a cylinder assembly caused this engine failure; rather it was just a 40-50% possibility. (Id. at 196-97).

**Crankcase:** Klepacki's third engine opinion was that a crack in the crankcase may have caused the engine failure. (Id. at 198). He was not, however, aware of any history of cracked crankcases of this model engine. (Id. at 198-99). He did not do any testing to determine if the crankcase was cracked and had no basis for the opinion – other than it was a possibility. (Id. at 201-2). Indeed, he agreed it was only a 5% remote possibility. (Id. at 202).

**Oil Leak:** The last possible cause of engine failure asserted by Klepacki was an oil leak "in general". (Id. at 202). Again, however, he had no basis for determining that this occurred. (Id. at 203).

> **1.  Klepacki's opinions are not based on facts in evidence, are inadmissible speculation, irrelevant, and could only serve to confuse or mislead the jury and prejudice Teledyne**

Klepacki presented no factual basis or testing that would support his opinions. Indeed, with respect to the oil delivery system and cylinder components, Klepacki conceded they were inconsistent with the evidence. None of the theories were based on any scientific probability as to one cause of the engine failure over another. As such, his opinions are simply inadmissible speculation and of no assistance to the trier of fact. See cases cited at section I, supra. Klepacki should not be allowed to so speculate at the expense of confusing or misleading the jury and prejudicing Teledyne. See Fed. R. Evid. 403.

## CONCLUSION

In light of the foregoing**,** Teledyne requests the entry of an order precluding and/or limiting the testimony of experts, Sommer, Coffman and Klepacki.  Their expert testimony, as it relates to Teledyne, is not relevant or reliable. Much of the expert testimony discussed above is not even supported by good grounds or a factual basis in the record and is therefore sufficiently

unreliable. The testimony is unhelpful, confusing and more prejudicial than probative. Furthermore, to the extent the opinions offered by the experts are the same, Plaintiff should be limited to one expert per opinion. Teledyne believes that oral argument will significantly aid the Court in deciding this motion and therefore concurrently has filed a request for oral argument.

Respectfully submitted,

*s/ Amy Furness*
BENJAMINE REID
Florida Bar No.: 193522
E-Mail: breid@carltonfields.com
AMY E. FURNESS
Florida Bar No.: 0034355
E-Mail: afurness@carltonfields.com
CARLTON FIELDS, P.A.
100 S.E. 2nd Street, Suite 4000
Miami, Florida 33131-9101
Telephone: (305) 530-0050
Facsimile:  (305) 530-0055

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 24, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

_s/Amy Furness_
Amy E. Furness
Florida Bar No.: 0034355

## SERVICE LIST
### Eberli v. Cirrus Design Corporation
### Case No.:  0:08-CV-60273-UU/TURNOFF
### United States District Court, Southern District of Florida

CAROLINA MAHARBIZ
E-Mail:  cmaharbiz@podhurst.com
RICARDO M. MARTINEZ-CID
E-Mail:  rmcid@podhurst.com
STEVEN CRAIG MARKS
E-Mail:  smarks@podhurst.com
PODHURST ORSECK
    JOSEFSBERG, ET AL.
City Nation Building
25 West Flagler Street, Suite 800
Miami, Florida 33130
Telephone:  305-358-2800
Facsimile:  305-358-2382

*Attorneys for Plaintiff,*
*Elisabeth Eberli, as Personal*
*Representative of the Estate of Fritz*
*Ernst Schoder, Deceased, a Florida*
*representative of a Florida decedent*

Via CM/ECF

PATRICK E. BRADLEY
E-Mail:  pbradley@reedsmith.com
REED SMITH, L.L.P.
136 Main Street, Suite 250
Princeton Forrestal Village
Princeton, New Jersey 08540
Telephone:  609-987-0050
Facsimile:  609-951-0824

COURTNEY BATEMAN
E-Mail:  cbateman@reedsmith.com
REED SMITH, L.L.P.
1301 K Street, N.W.
Suite 1100, East Tower
Washington, D.C. 20005
Telephone: 202-414-9265
Facsimile:  202-414-9299

JOSE I. ASTIGARAGA
E-Mail:  jia@astidavis.com
EDWARD M. MULLINS
E-Mail:  emullins@astidavis.com
ARNOLDO B. LOCAYO
E-Mail:  alacayo@astidavis.com
ASTIGARAGA DAVIS
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Telephone:  305-372-8282
Facsimile:  305-372-8202

*Attorneys for Defendant*
*Cirrus Design Corporation*

Via CM/ECF